William C. McBRIDE, Appellant,

v.

MERRELL DOW AND PHARMACEUTICALS INC., an Ohio Corporation, et al.

No. 82–1786.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 8, 1983.

Decided Sept. 27, 1983.

W. David Allen, Greenbelt, Md., for appellant.

Robert X. Perry, Jr., Washington, D.C., for appellee American Association for the Advancement of Science and Gina Bari Kolata.

H. Thomas Howell, Baltimore, Md., with whom Sidney G. Leech, Baltimore, Md., was on the brief, for appellees Merrell Dow Pharmaceuticals Inc., et al.

Before WRIGHT and BORK, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Appellant William G. McBride, an Australian expert in the field of teratology—the study of agents that can cause developmental abnormalities in embryos—challenges the dismissal of his defamation action for failure to state a claim on which relief can be granted. The alleged defamation was contained in a magazine article. Our jurisdiction rests entirely upon the parties' diverse citizenship and we must apply District of Columbia defamation law. That law suggests that the complaint states one claim upon which relief can be granted. Moreover, *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), indicates that, despite first amendment concerns, the burdens of discovery do not justify reading stricter pleading requirements into the law of defamation. It follows that, though we affirm most of the district court's judgment, we must reverse in part. We are troubled by litigation such as this, however. The ability to frame a pleading that defeats, however narrowly, a motion to dismiss ought not to be converted into a license to harass. We suggest, therefore,

that the district court proceed upon remand in a manner that will minimize, so far as practicable, the burden a possibly meritless claim is capable of imposing upon free and vigorous journalism.

### I.

This defamation action arises from the publication of an article entitled "How Safe Is Bendectin?" that appeared in the October 31, 1980, issue of *Science* magazine. Bendectin is a prescription drug taken for nausea and vomiting during pregnancy. It has generated controversy in recent years because of its alleged capacity to cause birth defects similar to those attributed to thalidomide. Merrell Dow and Pharmaceuticals, Inc.[1] ("Merrell Dow"), which manufactured and marketed the drug for about 25 years, recently discontinued manufacture of the drug, due, it has been said, to the burden of litigating suits that challenged its safety. N.Y. Times, June 10, 1983, at A16, col. 1.[2]

Dr. McBride, who filed the complaint for defamation, is a citizen of Australia and a research physician well-known for his work in the field of teratology. Among other accomplishments, he played a role in showing that thalidomide could cause birth defects. The article in *Science,* which was written by defendant Gina Bari Kolata, made the following statements about Dr. McBride:

> The FDA panel had an opportunity to hear four of the expert witnesses who testified for the plaintiffs in the Florida trial. Their data, said scientists who attended the meeting, were hardly convincing. FDA panel member Gordon Avery, of the Children's Hospital in Washington, D.C., said that "As far as I'm concerned, the purpose of the hearing was to objectively view the scientific data. None of

these people brought anything other than special pleading."

> These expert witnesses included William McBride of the Women's Hospital in Sydney, Australia, who was paid $5,000 a day to testify in Orlando. In contrast, Richardson-Merrell pays witnesses $250 to $500 a day, and the most it has ever paid is $1,000 a day. McBride was one of the first to suspect that thalidomide caused birth defects. He contends that Bendectin, too, causes deformed arms and legs, and he said at the trial that, in his opinion, Bendectin caused David Mekdeci's malformations. For much of his talk at the FDA meeting, McBride dwelt on the effects of thalidomide, leading Avery to say, "Dr. McBride, you have convinced me that thalidomide is a teratogen but I must in my own mind focus on the drugs that are in Bendectin."

> Another of Belli's witnesses was Beverly Paigen of Roswall Park Memorial Institute.[3]

The complaint alleges that the article injures Dr. McBride's personal reputation (Complaint ¶ 16) and his standing as a medical scientist (Complaint ¶ 14). In particular, the complaint identifies as false and defamatory three kinds of statements: (1) statements linking Dr. McBride with attorney Melvin Belli (Complaint ¶ 13(a)); (2) statements juxtaposing the assertion that Dr. McBride was paid $5,000 a day to testify with the assertion that Richardson-Merrell pays its expert witnesses only $250 to $500 a day, and at most $1,000 (Complaint ¶ 13(b)); and (3) statements "indicating to the general public that Dr. McBride did not know what he was talking about" when he testified before a Food and Drug Administration panel (Complaint ¶ 13(c)). The complaint further claims that defendant Irvine "was a paid 'public relations' agent or employee of [Merrell Dow]" who "spread lies

---

**1.** The complaint names a number of corporate and individual defendants affiliated with Merrell Dow and Pharmaceuticals, Inc. For the sake of convenience, we refer to all of them as "Merrell Dow."

**2.** *In re Richardson-Merrell Inc. "Bendectin" Products Liability Litigation,* 533 F.Supp. 489,

490 n. 1 (Jud.Pan.Mult.Lit.1982), indicates that at least 52 actions challenging the safety of the drug had at that time been filed in federal courts.

**3.** For the text of the entire article, see Appendix A *infra,* pp. 1467–1470.

and deceit" at the instigation of Merrell Dow to the author of the article (Complaint ¶ 8), and that Merrell Dow widely disseminated the articles or portions thereof "as part of its scheme to silence plaintiff, indoctrinate the scientific community and avoid or stall access to the courts for maimed babies ("Complaint ¶ 12). The complaint alleges that all the defendants engaged in their actions "with actual malice" and without "a good faith belief in the truth of their publication" (Complaint ¶ 22).

The complaint also notes that *Science* magazine published a correction in its July 24, 1981 issue, in response to a request from the plaintiff identifying the allegedly libelous statements, but the complaint claims that the correction is "inadequate" and "does not amount to a retraction as demanded."[4] Complaint ¶¶ 19, 20. The complaint seeks general damages, special damages, and punitive and exemplary damages of many millions of dollars (Complaint ¶¶ 26–28, 32). Exhibits detailing Merrell Dow's distribution of the article accompany the complaint.

## II.

The district court in a Memorandum Opinion and Order dismissed the complaint with prejudice, holding that "nothing in the article is found capable of bearing a defamatory meaning." 540 F.Supp. 1252, 1255 (D.D.C.1982). In construing the allegedly defamatory nature of the article, the court relied on the standard that a publication is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community" and if it is "more than merely unpleasant or offensive" but "make[s] the plaintiff appear 'odious, infamous, or ridiculous.'" *Id.* at 1254 (citations omitted). Whether a publication is capable of being interpreted as defamatory under such a standard, the court held, is a legal issue to be decided by the court, *id.* at 1254–55, citing *Harrison v. Washington Post Co.,* 391

A.2d 781 (D.C.1978), and *Restatement (Second) of Torts* § 614 (1977).

An identical lawsuit against the same parties was filed in the Superior Court for the District of Columbia on August 28, 1981, some two months before the present action was filed in the district court. On August 10, 1982, while the present appeal was pending, the Honorable Carlisle E. Pratt filed an order dismissing that case with prejudice and stating that "but for Judge Parker's opinion having issued first, this Court would have dismissed Plaintiff's claim on the merits." *McBride v. Merrell Dow and Pharmaceuticals, Inc.,* Civ. Action No. 12664–81 (Aug. 10, 1982).

The district court analyzed separately each of the three ways in which the article was allegedly defamatory. It accepted as true, as it had to under Fed.R.Civ.P. 12(c), Dr. McBride's contention that he does not know and had never met Melvin Belli (Complaint ¶ 13(a)), and it agreed that the article contained the "erroneous implication that Dr. McBride was called as a witness for Belli in the Florida trial." 540 F.Supp. at 1255.[5] The article called Belli "flamboyant" and the court noted that Belli "is a controversial figure in the legal profession." *Id.* It concluded, however, that there was no suggestion in the article that Belli had engaged in any improper conduct and that "an expert witness' mere association with such a person cannot be construed as defamatory." *Id.*

The district court provided a lengthier analysis of the complaint's claim that the article's treatment of the $5,000 a day paid to Dr. McBride for his testimony implied that Dr. McBride "is willing to prostitute his professional expertise and testify on behalf of the highest bidder." (Complaint ¶ 21). It reasoned that the $5,000 figure standing alone was not defamatory and observed that "[a] high level of remuneration suggests, if anything, a high degree of pro-

---

4. *See* Appendix B *infra,* p. 1471.

5. It appears that Melvin Belli was the attorney of record in the *Mekdeci* litigation in Florida,

but that the case was tried by his co-counsel and that Dr. McBride's contacts were limited to the latter.

fessional accomplishment." 540 F.Supp. at 1255. Suggesting that if the discussion of the fees were defamatory, it had to be because of the inference of the lack of professional integrity to be drawn from the juxtaposition of McBride's higher fees with the lower fees paid by Merrell Dow, the district court concluded:

> The inference is improbable. The article clearly indicates that Dr. McBride is an expert in this area and not a "prostitute." The article recognizes that McBride made an important scientific contribution as "one of the first to suspect that thalidomide caused birth defects." Moreover, the innuendo drawn by the plaintiff is undermined by his own admission that although he was not paid $5,000 per day, he was, in fact, paid $1,116 per day. No other expert witness, according to the article, was paid more than $1,000 per day. Thus, even the plaintiff concedes that he received a higher rate of remuneration than any other expert witness in the Orlando trial.[6]

*Id.*

With respect to the third allegation—that the article gave the impression that "Dr. McBride did not know what he was talking about"—the district court relied on two alternate grounds to reach its conclusion. First, it noted that Avery's comments, which seem to form the principal basis for this claim, must be read as meaning that "McBride's scientific analysis was unconvincing" and not that "Dr. McBride is 'ignorant' of his subject matter." 540 F.Supp. at 1255. So interpreted, the assertion could not be considered defamatory. Secondly, the court noted that "even if Avery had directly stated that the plaintiff is ignorant

of his subject matter, such a statement would properly be considered a non-defamatory statement of opinion." *Id.,* citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974), and *Ollman v. Evans,* 479 F.Supp. 292, 293 (D.D.C.1979).[7]

The court concluded that none of the allegedly defamatory elements of the article involved "disgrace" or could subject Dr. McBride to "public ridicule and contempt." 540 F.Supp. at 1255–56.

### III.

We agree with the district court that two of McBride's three instances of alleged defamation do not rise to the level of defamation.

■ First, the portions of the article that link Dr. McBride with Melvin Belli cannot be construed as defamatory. Though the article describes Belli as "flamboyant," that does not make being identified as a witness for one of his clients a defamatory statement. This claim is frivolous and verges on the preposterous. In any event, since Dr. McBride was a witness for litigants represented by Belli, though Belli himself did not appear at the trial, and since Belli referred to McBride as one of his witnesses, it is true, in a literal sense, that McBride was one of Belli's witnesses even though the two never met. But, as we have said, even if the statement were wholly inaccurate, it would not be defamatory.

■ Second, publication of the remarks made by Dr. Avery at the FDA panel hearing cannot be considered actionable. There is no suggestion by Dr. McBride that Dr.

---

**6.** It was indicated at oral argument that Dr. McBride was paid 1,000 Australian dollars a day both for his testimony and for his travel time from Australia and that his total reimbursement, including airfare, amounted to approximately 5,000 American dollars for the single day he testified at the Orlando trial. The record also includes excerpts from talks delivered by Belli where he is quoted as saying: "It cost me $5,000 a day to bring [Dr. McBride] to the Mekdeci case," Record Excerpt 75, and "[w]e've got a guy, McBride, here from Australia, $5,000 a day. Hell, when he crossed the

international dateline he charged us twice." *Id.* at 72. *See also* Belli, *Demonstrative Evidence,* 3 Trial Dipl. J. 26, 26–27 (1980), and Belli, *The State of the Law in the 80's,* 9 San Fern.V.L.Rev. 1, 5 (1981).

**7.** We have recently reversed the district court decision in *Ollman v. Evans,* 713 F.2d 838 (D.C. Cir.1983), but we do not read the three opinions in that case as casting doubt on the fact/opinion distinction as it applies to Avery's comments.

Avery's comments were not reported accurately. The most that can be said of those remarks is that a reader might conclude that Avery thought McBride was spending an unnecessary amount of time recounting the dangers of thalidomide, hardly a conclusion likely to bring McBride into contempt. A suggestion of long-windedness or irrelevance is not defamatory. In any case, the comments themselves would seem to be protected under District of Columbia law as a report "of official proceedings and public meetings." *See Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 87–88 (D.C. 1980).

■ It is not possible for us to conclude, however, that the published statement that McBride was paid $5,000 a day to testify in the Florida trial, particularly when directly compared with the amounts Merrell Dow paid its expert witnesses, is incapable of bearing a defamatory meaning. It is possible that a reader might conclude that plaintiffs' case was so weak they had to pay that much to get any expert to testify, and hence that Dr. McBride's testimony was for sale. The standard to be applied in evaluating the dismissal of a complaint under Fed. R.Civ.P. 12(b)(6) is a stringent one. The Supreme Court has set the example:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (emphasis added). *See also Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). McBride argues that the district court failed to comply with this standard and instead implicitly and improperly reasoned that since the article *could* be read as *non*-defamatory, it could *not* be read as defamatory. He notes that the District of Columbia is not a jurisdiction that has adopted this "innocent construction rule," and he contends that when a statement is capable of two or more interpretations, one

of them defamatory, it is for the jury to decide whether the defamatory meaning was the one communicated. Under District of Columbia defamation law, a court's power to hold as a matter of law that a statement is not defamatory is very limited. "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Levy v. American Mutual Ins. Co.,* 196 A.2d 475, 476 (D.C.1964). *See also Curtis Publishing Co. v. Vaughan,* 278 F.2d 23, 26 (D.C.Cir.), *cert. denied,* 364 U.S. 822, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960). First amendment considerations, insofar as they might create a presumption in favor of dismissal, do not affect this determination at the pleading stage, *Nader v. de Toledano,* 408 A.2d 31, 49–50 (D.C.1979).

Since it is not beyond doubt that a reasonable person might read the article as conveying defamatory falsehoods, we reverse. As this court has previously noted,

> plaintiff need not show tendency to prejudice him in the eyes of everyone in the community or all his associates. It suffices to establish defamation that the publication tends to lower plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community of plaintiff's associates.

*Afro-American Publishing Co. v. Jaffe,* 366 F.2d 649, 654 n. 10 (D.C.Cir.1966) (citations omitted).

We do not, of course, suggest that Dr. McBride has actually been defamed. There is a sense in which the fee statement is correct since the attorneys paid McBride $5,000 and received one day of testimony in return, although McBride is said to have regarded the sum as reimbursement for five days away from his practice. Nor do we indicate any view whether other parts of the articles or the retraction made sufficiently remove any defamatory implication from the statement about fees, or whether appellees properly relied upon Belli's statement that he had paid Dr. McBride $5,000 per day. See note 6 *supra*.

■ Even if it is acknowledged that this portion of the article can bear a defamatory meaning, McBride's complaint would probably still fail to state a claim on which relief could be granted if McBride had not pleaded actual malice. To prevail in a libel action against the media, a public figure must prove knowledge of falsity or reckless disregard for the truth. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1963).

Though the district court did not rule upon the point and we do not foreclose any decision that court may make after briefing and argument, we think it highly likely, in the context in which this case arises, at least, that Dr. McBride is a public figure. His complaint states that he "has gained international respect and renown for his research in the field of teratogenics" (Complaint ¶ 1) and that defendants attacked his "worldwide reputation in the specialized field of teratology" (Complaint ¶ 13). International fame as a researcher might or might not make McBride a public figure for purposes of libel law; we do not address that question, for it seems quite probable that the doctor's additional activities bring him within the definition that the Supreme Court gave in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974): "commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.... [T]hey invite attention and comment." *See Hoffman v. Washington Post Co.,* 433 F.Supp. 600 (D.D.C.1977), aff'd mem. 578 F.2d 442 (D.C.Cir.1978). Besides his earlier participation in the thalidomide controversy, Dr. McBride thrust himself to the forefront of the public debate concerning Bendectin when he traveled from Australia to the United States to testify both before an FDA panel and for the plaintiffs in a damage action in Florida. The great interest generated by the arguments about Bendectin is indicated by the article that prompted this lawsuit, including the article's account of the turmoil at the FDA panel's public hearing. Dr. McBride, who had been active in the thalidomide dispute, certainly understood that the Bendectin debate would probably not consist of a quiet exchange of views among scholars. In coming forward to play a prominent role in a heated public controversy he rendered himself a public figure—someone who might expect public commentary both admiring and, as is not uncommon when passions run high and substantial interests are at stake, of a hurtful and perhaps unfair nature.

Bendectin has been a widely used drug for which there appears to be no adequate substitute. Thousands of people are acutely concerned about its safety. Because it was a matter of intense public debate whether the FDA should take action, and, if so, what kind of action, the controversy about Bendectin had a pronounced political component. Inevitably, partisan advocacy characterized the discussion. Robust, wide-open debate requires that one who chooses to join in have a thicker skin than has been displayed here. Only the allegation that the statement about Dr. McBride's fees was a deliberate falsehood which was intended to, and had the effect of, damaging his reputation saves the complaint from dismissal. Given the tenor of the total article and other facts of which we are aware, the allegation may seem improbable, but we cannot deny Dr. McBride any opportunity to back it up with evidence.

■ This case highlights the problems posed by contemporary libel law. *See* Smith, *The Rising Tide of Libel Litigation: Implications of the Gertz Negligence Rule,* 44 Mont.L.Rev. 71 (1983); Garbus, *The Limits for Libel,* N.Y. Times, July 29, 1983, at A23. Libel suits, if not carefully handled, can threaten journalistic independence. Even if many actions fail, the risks and high costs of litigation may lead to undesirable forms of self-censorship. We do not mean to suggest by any means that writers and publications should be free to defame at will, but rather that suits—particularly those bordering on the frivolous—should be controlled so as to minimize their adverse impact upon press freedom.

It is, therefore, appropriate that discovery be limited initially to the extent feasible to those questions that may sustain summary judgment. As Justice Powell noted in his concurrence in *Herbert v. Lando,* 441 U.S. 153, 178, 99 S.Ct. 1635, 1650, 60 L.Ed.2d 115 (1979)—a concurrence that the Justice observed was not inconsistent with the opinion of the Court—a district court "in supervising discovery in a libel suit by a public figure, . . . has a duty to consider First Amendment interests as well as the private interests of the plaintiff." *See also* 441 U.S. at 177, 99 S.Ct. at 1649 (Majority Opinion) ("reliance must be had on what in fact and in law are ample powers of the district court to prevent abuse").

District of Columbia law also endorses the use, where possible, of summary procedures in handling libel actions. In *Nader v. de Toledano,* 408 A.2d 31, 42–43 (1979), the District of Columbia Court of Appeals described the virtues of summary judgment as follows: "[I]t . . . avoids needless expenditure, both by the courts and by the parties, of valuable resources in unnecessary trials, and mitigates the potential for misuse of the legal process by a party to harass adverse parties or to coerce them into settlement." The court found that these considerations take on a greater significance where a public official or public figure is involved in a libel action because of the potential threat to first amendment freedoms. *Id.* at 43. The court went on to quote with approval and at some length from the opinion by this court in *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). We find part of the language quoted especially apposite here:

> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. . . . Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered." *Smith v. People of State of California,* 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959).

365 F.2d at 968. The *Keogh* decision provides a model for the use of summary procedures in a case such as this. The disposition of this case may also be affected, of course, by the status of the identical lawsuit Dr. McBride filed in the Superior Court.

The decision of the district court is affirmed in part and reversed in part, and the case is remanded for proceedings not inconsistent with this opinion.

*So ordered.*

## APPENDIX A

### HOW SAFE IS BENDECTIN?

An FDA panel sees no evidence that it causes birth defects. Lawyers say they will sue anyway.

The safety of Bendectin, a drug taken for morning sickness in pregnancy, has become the subject of an emotional and intense debate among parents, lawyers, and medical scientists. Lawyers claim Bendectin is a new thalidomide and are seeking women who took the drug and bore deformed children to join in lawsuits against Richardson-Merrell Inc., the drug's manufacturer. A number of scientists are saying that the drug has never been shown to be dangerous to fetuses and, in the absence of any such evidence, the lawsuits are unwarranted.

What is really at issue is the more subtle question of how safe is safe. Does lack of evidence that a drug is harmful mean that it is not? Can a manufacturer be held liable for damages when scientists say they have a "residual uncertainty" about a product's safety? These questions go far beyond the specifics of the Bendectin case and extend to virtually every drug and possibly toxic substance to which people are exposed. For this reason, the Bendectin story has become a symbol of the quandaries that

arise when science is unable to provide definitive answers to questions of public health.

Bendectin is one of the more commonly used drugs during pregnancy. Richardson-Merrell estimates that 25 percent of pregnant women in the United States take the drug, and it is popular in other countries including Germany, Canada, and Great Britain. Some doctors, in fact, are said to hand out prescriptions for Bendectin along with prescriptions for prenatal vitamins.

Although Bendectin has been on the market for 23 years, doubts about its safety were voiced only in the past 2 years. They began in the medical community when Kenneth Rothman of the Harvard School of Public Health found a weak association between Bendectin and congenital heart defects. Last winter, the doubts about Bendectin reached the general public as a result of a highly publicized trial in Florida in which the flamboyant lawyer Melvin Belli represented the parents of a deformed boy whose mother had taken the drug.

In response to intense public interest in Bendectin, the Food and Drug Administration (FDA) moved up its scheduled hearings on the drug's safety from October to September. On 15 and 16 September, an FDA panel met in a hot, stuffy room crowded with lawyers to review animal data and 13 epidemiologic studies. It unanimously concluded that there is no demonstrated association between Bendectin and birth defects. However, the panel noted that because there is no way to prove absolute safety, there is a "residual uncertainty" about the drug's effects on fetuses.

The 13 studies reviewed by the FDA panel varied enormously in design and reliability, and most had an unresolvable limitation. Women were asked, usually after their babies were born, whether they had taken Bendectin. Hershel Jick of the Boston Collaborative Drug Surveillance Program observes that the "recall" method introduces an enormous problem of bias. Women with normal babies may forget they took the drug and those with malformed babies may

be more likely to remember—or vice versa. The bias is essentially unmeasurable.

Only two studies circumvented this problem. One was done by Jick himself, who examined computerized medical records at the Group Health Cooperative at Puget Sound for nearly 6000 pregnant women, 40 percent of whom were recorded as filling Bendectin prescriptions. He saw no indication that the drug caused an increase in any particular birth defect, including those that have been suspected of being caused by Bendectin, such as limb deformities and cleft lips or cleft palates.

The other study that is free of recall bias is one by Richard W. Smithells of the University of Leeds in England. Smithells also gauged Bendectin use on the basis of filled prescriptions. He reports no evidence of an increase in birth defects in general or in any specific type of birth defect in 2,000 women who took the drug as compared to 11,000 women who did not.

Ralph D'Agostino, a statistician at Boston University and an FDA panel member, argues, however, that from a statistical point of view it is more valuable to look at data from studies that focus on specific defects and then see if women who gave birth to children with these defects are more likely to have taken Bendectin. The method of looking at a whole spectrum of birth defects usually yields small numbers of babies with particular defects. For example, Jick found only 12 babies with limb deformities in his sample.

Most of the studies that focused on particular birth defects showed no relation between the defects and Bendectin. Two teams of researchers looked at specific defects, however, and found a slight association with Bendectin use. In one study, led by Rothman, there were weak associations between heart defects and aspirin, antibiotics, and Bendectin. He describes his results as at best "exploratory," not to be taken as indicating that Bendectin causes heart defects. He mentions particularly the problem of recall bias, since women were given an open-ended questionnaire about drug use.

Jean Golding of the University of Bristol in England asked doctors what they had prescribed for mothers of babies with cleft lips or palates and for mothers of normal babies, and found that the number of reported Bendectin prescriptions was slightly higher for mothers of babies with these birth defects. But Golding is ambivalent about her results because of the bias introduced by her method of ascertaining Bendectin use.

In the end, the discussion of Bendectin's safety came down to reasoning that more studies have been done on Bendectin than on any other prescription or non-prescription drug taken by pregnant women and nothing has shown that the drug is dangerous. Scientists at the FDA meeting also said that every agent that is known to cause birth defects causes a recognizable syndrome. No such syndrome has been associated with Bendectin. Since 30 million pregnant women have taken the drug, Jick says, he "would find it a shocking fluke if something were going on with the drug that we have missed."

The FDA panel did express concern, however, that the drug was associated with birth defects in the studies of Golding and Rothman, even though these findings were not confirmed by other studies. The panel noted that Bendectin is probably overprescribed. Certainly, scientists at the meeting argued, if the drug is to be used only for intractable nausea and vomiting, 25 percent of the pregnant women in this country (and 40 percent in Puget Sound) should not be taking it. Panel member Brian Little, a professor of obstetrics and gynecology at Case Western Reserve University, estimated that fewer than 10 percent of pregnant women should require Bendectin.

Belli says the FDA panel's decisions will not deter the lawsuits pending against Richardson-Merrell. "We will not rely on the FDA at all. We're going ahead with our own proof [that Bendectin causes birth defects]," he declared. His proof consists of a list of women who took the drug during pregnancy and bore children with limb defects. In addition, Belli has his own expert witnesses. But epidemiologists say a list of deformed children is not proof. Every year, about 90,000 babies are born with serious birth defects, and 3,000 of them have limb defects. By chance alone, then, if 25 percent of pregnant women take Bendectin, 750 babies with limb defects should be born each year to women who took the drug.

To find such babies, Belli has placed ads in U.S. newspapers and has traveled to England and Germany. He says he is thus far suing Richardson-Merrell on behalf of 75 women and knows of at least 125 Bendectin lawsuits, in addition to his own, that are going to trial. A Richardson-Merrell spokesman says, however, that only 36 lawsuits have been filed.

The hundreds of millions of dollars riding on the Bendectin suits drew a crowd of lawyers to the FDA meeting. Their vociferous questioning of the scientists who testified at the meeting so antagonized Robert Irvine, director of communications for Richardson-Merrell, that every time a lawyer was recognized, Irvine jumped up and pointed out that the questioner was an attorney who was engaged in litigation with his company. "I don't think this FDA hearing should be used for the process of discovery," Irvine kept saying. Finally, FDA panel chairman David Archer, of the University of Pittsburgh School of Medicine, declared that all further questions must be submitted to him in writing and he would then determine whether they would be answered.

One thing Belli and the other lawyers involved in litigation with Richardson-Merrell believe they have going for them is the company's past reputation. In the early 1960's the company tried to introduce thalidomide into the United States and marketed the drug in Canada. It was successfully sued on behalf of a number of U.S. children whose mothers were given thalidomide by doctors who received the drug as free samples, and on behalf of Canadian thalidomide children. The settlements ranged from $100,000 to $999,000.

Just before thalidomide, in 1960, Richardson-Merrell marketed Mer-29, a cholesterol-lowering drug that it envisioned millions of Americans taking each day like a vitamin pill. But Mer-29 turned out to cause cataracts and was withdrawn from the market in 1962. Richardson-Merrell was indicted for making false, fictitious, and fraudulent statements to the FDA about Mer-29 and was fined $80,000. Following the criminal indictment, 500 civil suits were filed by injured persons and Richardson-Merrell ended up paying $200 million in damages.

Public agitation about Bendectin began last October with an article in the National Enquirer that also compared the drug to thalidomide and included pictures of babies with deformed arms or legs. Prominently featured in the article was David Mekdeci, the Orlando, Florida, boy who was to be the subject of the first Bendectin lawsuit.

In January 1980 the trial involving David Mekdeci took place. The boy's parents, Michael and Elizabeth Mekdeci, sued Richardson-Merrell for $12 million. The Florida jury concluded that nothing should be awarded to the boy and denied any money to his parents for damages. It did, however, award the parents $20,000 for medical expenses. In May, Federal Judge Walter E. Hoffman ordered a new trial because, he said, the jury's verdict was "inconsistent." He argued that if the child was not damaged by Bendectin, the parents should not be awarded anything. A retrial is scheduled for January 1981, but Belli, "for reasons of honor and self-respect," asked not to represent the family the second time around. Belli calls Mrs. Mekdeci "a very difficult woman to work with. Besides, we've got much better cases."

The FDA panel had an opportunity to hear four of the expert witnesses who testified for the plaintiffs in the Florida trial. Their data, said scientists who attended the meeting, were hardly convincing. FDA panel member Gordon Avery, of the Children's Hospital in Washington, D.C., said that "As far as I'm concerned, the purpose of the hearing was to objectively view the scientific data. None of these people brought anything other than special pleading."

These expert witnesses included William McBride of the Women's Hospital in Sydney, Australia, who was paid $5,000 a day to testify in Orlando. In contrast, Richardson-Merrell, pays witnesses $250 to $500 a day, and the most it has ever paid is $1,000 a day. McBride was one of the first to suspect that thalidomide caused birth defects. He contends that Bendectin, too, causes deformed arms and legs, and he said at the trial that, in his opinion, Bendectin caused David Mekdeci's malformations. For much of his talk at the FDA meeting, McBride dwelt on the effects of thalidomide, leading Avery to say, "Dr. McBride, you have convinced me that thalidomide is a teratogen but I must in my own mind focus on the drugs that are in Bendectin."

Another of Belli's witnesses was Beverly Paigen of Roswell Park Memorial Institute. Paigen stressed that she is a cancer researcher, not a teratologist. Nonetheless, she concluded that Bendectin caused birth defects in 5 of 1000 babies whose mothers took the drug. D'Agostino commented to Science that "Her [Paigen's] interpretation of the data just is not warranted." He remarked, "The committee as a whole took them [Belli's four witnesses] as a set of presentations that didn't necessarily appear to contribute anything to the real discussion."

Despite the FDA panel's cautions and carefully worded conclusions, the forthcoming court cases will probably convince many women that Bendectin may cause birth defects. As a result of fear of Bendectin, Little predicts, doctors may start prescribing different drugs to combat nausea and vomiting, even though extremely little is known about alternative drugs. Despite the FDA panel's residual uncertainty about Bendectin's safety, it remains the best-studied drug taken by pregnant women. "I wish we knew as much about aspirin," said one scientist at the meeting.

—GINA BARI KOLATA

APPENDIX B

Correction

In an article titled "How Safe is Bendectin?" (31 Oct. 1980, p. 518), it was incorrectly reported that William McBride of Sydney, Australia, was paid $5000 a day to testify as an expert witness in a court case involving allegations that Bendectin caused birth defects in a Florida child named David Mekdeci. McBride was not paid for certain testimony. Rather, he was compensated for time away from his Australian practice at a rate of approximately $1116 a day so that he could appear as an expert witness on behalf of the Mekdeci family. He was also reimbursed for his travel expenses to and from Australia. *Science* regrets the error.

[*Science,* July 24, 1981, at 395]