**Steven J. ROSEN, Appellant,**

v.

**AMERICAN ISRAEL PUBLIC AFFAIRS COMMITTEE, INC., et al., Appellees.**

**No. 11–CV–368.**

District of Columbia Court of Appeals.

Argued Feb. 14, 2012.

Decided April 26, 2012.

---

David H. Shapiro, Washington, DC, for appellant.

Thomas L. McCally, with whom William J. Carter and Allie M. Wright, Washington, DC, were on the brief, for appellees.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and FERREN, Senior Judge.

FERREN, Senior Judge:

In this action for defamation, Steven J. Rosen appeals the trial court's grant of summary judgment for defendant-appellees: his former employer, American Israel Public Affairs Committee (AIPAC), and Patrick Dorton, AIPAC's "spokesman."[1] After AIPAC fired Rosen, a long-time employee, it made statements about him reported in the *New York Times* in 2005 and 2008. The first statement purported to justify his firing because of behavior that differed from "the conduct that AIPAC expects from its employees." The second statement essentially repeated the first one and added that "AIPAC still held that view of [Rosen's] behavior." As the statute of limitations has run on the first statement, Rosen seeks compensatory and punitive damages for the second statement only. Finding no error, we affirm.

---

1. Hereafter, we shall refer to both appellees together as AIPAC.

## I. Facts and Procedural History

Rosen was AIPAC's Director of Research, then Director of Foreign Policy Issues, for almost twenty-three years. In the latter position, according to the complaint and the trial court's findings, he was expected to "maintain relationships with [government] agencies, receive [foreign policy] information, and share it with AIPAC Board of Directors and its Senior Staff for possible further distribution." During his tenure at AIPAC, Rosen allegedly received classified information. As reported by the *New York Times* of March 3, 2008, knowledgeable individuals revealed a "surreptitiously recorded conversation[ ]" on July 21, 2004, among Rosen, an AIPAC colleague, and a *Washington Post* reporter, Glenn Kessler. According to the *Times*, the tape revealed that Rosen, using a "boastful tone," gave Kessler information about the Middle East that Rosen and his colleague "had received from government officials." According to these individuals, that tone "may have been used to suggest that [AIPAC's] knowledge reflected [AIPAC's] great influence within the administration," a suggestion that made the conversation "potentially embarrassing" to AIPAC. Rosen testified on deposition that his colleague had told the reporter that he hoped the reporter would not get in trouble after receiving the information, whereupon Rosen interjected that the United States had no Official Secrets Act [2] that would expose a journalist to prosecution for publishing classified information.

A month later, on August 27, 2004 (according to trial court findings), "it was publicly disclosed that the United States Department of Justice ... was investigating Rosen and another AIPAC employee for receiving classified information." Six months later, on February 17, 2005, AIPAC suspended Rosen. A few weeks after that, federal prosecutors gave AIPAC's outside counsel, Nathan Lewin, a limited security clearance to receive classified information pertaining to the investigation. Lewin was not allowed to disclose the particulars to AIPAC, but he sent his client a letter recommending termination of Rosen's employment because he had "engaged in activity that AIPAC cannot condone." Rosen was fired on March 21. The trial court found that "beginning in April 2005, AIPAC ... made several statements concerning Rosen's termination to the press." No one disputes Rosen's allegation in the complaint that on April 21, 2005, as reported in the *New York Times*, AIPAC's spokesman, appellee Dorton, said that Rosen had been fired because his actions differed from "the conduct that AIPAC expects from its employees." [3] Several months later, on August 4, 2005, a federal grand jury indicted Rosen on charges of espionage. (The charges were dismissed on May 1, 2009, after AIPAC had spent more than $4 million funding Rosen's legal defense.)

On March 2, 2009, four years after Dorton's statement on behalf of AIPAC first appeared, Rosen filed suit against AIPAC, Dorton, and ten members of AIPAC's Board of Directors for "Defamation (Libel

---

**2.** The Official Secrets Act provides for the protection of state secrets and official information, mainly related to national security. *See, e.g.,* Official Secrets Act 1989 (March 22, 2012, 4:24 p.m.), http://www.legislation.gov.uk/ukpga/1989/6/contents.

**3.** Also according to the complaint, the July 7, 2005 *New Yorker* magazine attributed the following, similar statement to Dorton: "Rosen [and his colleague] were dismissed because they engaged in conduct that was not part of their jobs, and because this conduct did not comport with the standards that AIPAC expects and requires of its employees."

and Slander)."[4] He premised his complaint on a *New York Times* article of March 3, 2008, that repeated (but slightly revised) AIPAC's 2005 statement in the *Times* about the termination of Rosen's employment. Quoting from the complaint, the trial court noted that in this 2008 *Times* article,

[t]he AIPAC spokesman on the Rosen [and the other employee] matter, Patrick Dorton, said at the time [in 2005] that the two were dismissed because their behavior *"did not comport with the standards* that AIPAC expects of its employees." He said recently that AIPAC still held that view of their behavior.[5] [Emphasis added.]

The article elaborated on the incident, noting that Rosen had been charged with "conspiracy to communicate national defense information" and with "aiding and abetting the conspiracy."[6]

As summarized by the trial court, Rosen's complaint alleged that his "February

17 suspension was AIPAC's response to implicit threats by the Justice Department that AIPAC itself could become the target of the investigation 'if AIPAC did not act against [him].'" The court elaborated:

Subsequently, according to Rosen, AIPAC fired him after federal prosecutors insisted that AIPAC abide by a Justice Department memorandum calling for "the firing of the corporate employees who allegedly engaged in the wrongdoing [and] condemning their actions publicly...." AIPAC complied with these directives in order to curry favor with the Justice Department and avoid prosecution, even though its Board "knew absolutely that Steven Rosen had done nothing wrong, indeed, nothing which they had not known about and authorized." [Citations to complaint omitted.]

On October 30, 2009, in response to a defense motion, the trial court dismissed on grounds of immunity[7] all defendants

---

4. Another defendant, Rational PR, L.C., was dismissed at the initial scheduling conference on June 5, 2009.

5. As noted in the text above at note 3, the statement reported in the *New York Times* of April 21, 2005 did not include the word "standards" that was included with the statement in the 2008 article—a word, as we shall see, that is central to the dispute here. On the other hand, by including the word "standards," the 2008 *Times* article essentially incorporated language from a July 7, 2005 *New Yorker* magazine article that Rosen referenced in his complaint (and is quoted above in note 3). AIPAC therefore does not dispute that, when Dorton said in 2008 that AIPAC "still held" the view of employee behavior that it expressed in 2005, it was referring to a 2005 statement about "standards" (whatever its source) that was repeated in the 2008 *New York Times* article.

6. Rosen sought $5 million in compensatory damages from all defendants, jointly and severally; $10 million in punitive damages from AIPAC; and $5 million in punitive damages from every other defendant. At his deposi-

tion, Rosen acknowledged that he was not making a claim for lost income; rather, he was seeking monetary damages from AIPAC for "putting me in the zone of danger through knowingly false statements, with reckless disregard for the truth; putting me in the zone of danger of being convicted for a crime that I did not commit" and for "materially increas[ing] the chance of ... conviction."

7. D.C.Code § 29–406.90(b)(1), (4) (Supp. 2011) provides that "[a]ny person who serves as a volunteer of the corporation shall be immune from civil liability except if the injury or damage was a result of: [t]he willful misconduct of the volunteer ... [or] [a]n act or omission that is not in good faith and is beyond the scope of authority of the corporation pursuant to [D.C.Code § 29–406.90] or the corporate charter." Rosen argued that the defendants, who were volunteer board members, knowingly made false and defamatory statements, which he argued was "willful misconduct." Rosen also argued that "any assertion of statutory immunity for the critical part they played in the defamatory acts at issue [was] ... lost" because their actions

except AIPAC and Dorton. The court also dismissed, as time barred, all claims for defamation except the claim attributable to the sentence in the March 3, 2008 *New York Times* article stating that "AIPAC still held that view of [Rosen's] behavior." The reference to "that view" meant the 2005 statement that Rosen's behavior, as restated in the 2008 article, "did not comport with the standards that AIPAC expects of its employees"—the principal statement for which the statute of limitations had run. Appellant does not challenge the trial court's limitation of his claim to the 2008 sentence in the *Times* article that the court preserved. The central issue remaining, therefore, was whether AIPAC's March 3, 2008 statement was defamatory. On February 23, 2011, after completion of discovery, the trial court granted summary judgment in favor of AIPAC and Dorton on the ground that the statement was not "provably false, and therefore, not defamatory as a matter of law."

Before proceeding to our legal analysis, it is important to make clear that the AIPAC statement under scrutiny here— that in 2008 AIPAC "still held" its view of Rosen's 2005 behavior—necessarily incorporated information from 2004–2005 that AIPAC had received after it made the earlier statement during the period while Rosen was under federal investigation. By the time in 2008 when AIPAC publicly reaffirmed its belief that Rosen's behavior had not comported with the standards AIPAC expected of its employees, AIPAC had discovered more about Rosen's conduct while at AIPAC than it had known when it made the 2005 statement. Of major significance, AIPAC had learned

that Rosen had been indicted, and remained under indictment, when the March 3, 2008 article was published. Furthermore, after its 2005 statement, AIPAC learned from the indictment that Rosen had disregarded the advice of AIPAC's general counsel after the following incident.

Early in the morning on August 27, 2004, two FBI agents had come to Rosen's home and, according to Rosen on deposition, had engaged with him in an intense exchange of words. As Rosen later admitted on deposition, the FBI agents "said they had reason to think I was lying when I told them that I did not receive classified information from" a named Department of Defense (DOD) official. That accusation caused Rosen to say he would stop talking until he obtained an attorney, whereupon one of the agents told Rosen that he had better "get a lawyer by 10:00 a.m. [that day]." Rosen then called AIPAC's general counsel, Phil Friedman, to report the FBI visit, and Friedman replied, according to Rosen, that "we should convene in the office." Admittedly, however, before going to AIPAC to meet with Friedman, Rosen went to a restaurant to discuss with the Deputy Chief of Mission at the Israeli embassy (in Rosen's words) the "extremely serious" FBI "allegation that some Israeli had received a classified document" from Rosen's DOD contact—only to discover that FBI agents had followed him there. When asked on deposition whether Friedman had asked him to come "right away," Rosen replied, "I don't think so. I think it was a little later. I don't know." However, AIPAC's Executive Director, Howard Kohr, had a different understanding, testi-

---

were "[a]n act or omission that is not in good faith and is beyond the scope of authority of the corporation pursuant to this subchapter or of the corporate charter." The trial court ruled that Rosen did "not allege[ ] sufficient facts to satisfy a showing of willful miscon-

duct by Board Member Defendants nor any act or omission by the Board Member Defendants that [was] not in good faith and [was] beyond the scope of authority of the corporation pursuant to D.C.Code § 29–406.90 or the corporate charter."

fying on deposition that Friedman had advised Rosen "to come immediately to the office." Whatever clarity, or lack thereof, there was about how quickly Rosen was advised to report to Friedman—and in the end Rosen acknowledged, "I don't know"—Kohr held to his view that, in taking the detour to convene first with the Israeli official, Rosen had failed to meet "the standards of AIPAC employees" by "disregarding counsel's advice."

AIPAC learned even more from the indictment. After Rosen's confrontation by the FBI on August 27, 2004, he had not revealed to AIPAC the significance of the DOD contact from whom he had received the putative classified information. Despite his confrontation with the FBI about his DOD contact (which Rosen revealed to AIPAC after his restaurant detour to meet the Israeli official), Rosen characterized his DOD contact to AIPAC's Howard Kohr (in Kohr's words) as a "kook, a nobody, an insignificant figure." Addressing the same incident on deposition, Rosen essentially confirmed (or at least did not discredit) Kohr's testimony by acknowledging he told AIPAC officials that his contact "was much less important to me than a lot of people." As a result, according to Kohr on deposition, AIPAC had been unaware of the "importance" of Rosen's contact—of "the nature of the relationship between them"—until learning about that relationship not from Rosen but from "the indictment" and, later, from the "Washingtonian Magazine." That failure by Rosen to disclose the real situation, said Kohr, reflected "a lack of total candor."

From this enlarged factual basis for AIPAC's 2008 statement, we turn to the law that applies here.

## II. Standard of Review

We review the grant of summary judgment *de novo*.[8] To justify summary judgment, the moving party "must demonstrate that there is no genuine issue of material fact and that [it] is entitled to judgment as a matter of law."[9] On review of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[10]

## III. Statute of limitations

In the District of Columbia, the statute of limitations for defamation is one year.[11] We have adopted the single publication rule in which the statute begins to run at the time the allegedly defamatory statement was first published.[12] Republication does not create a new cause of action. As discussed above, the only statement at issue here, not barred, is the March 3, 2008 statement that "AIPAC still held that view of [Rosen's] behavior"—that is, that AIPAC, based on evidence both before and after the April 21, 2005 statement, still held the view in 2008 that Rosen's behavior, as of April 21, 2005, did not comport with standards AIPAC expected of its employees. AIPAC does not argue that this is a barred republication.

## IV. Applicable Law

To pursue a claim for defamation, a plaintiff must allege and prove four elements:

**8.** *Steward v. Moskowitz*, 5 A.3d 638, 646 (D.C. 2010).

**9.** *Clyburn v. 1411 K Street Ltd. Partnership*, 628 A.2d 1015, 1017 (D.C.1993) (citing Super. Ct. Civ. R. 56(c)).

**10.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**11.** D.C.Code § 12–301(4) (2001).

**12.** *See Mullin v. Washington Free Weekly*, 785 A.2d 296, 298 & n. 2 (D.C.2001).

(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.[13]

A publication is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community."[14] However, "an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'"[15] The defamatory nature of a statement cannot be ascertained, moreover, unless it is "capable of bearing a defamatory meaning."[16] Equally important, however, the statement must be "false" as well as "defamatory." The Supreme Court has stressed that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law."[17] As a general rule, therefore, whereas "a statement of fact may be the basis for a defamation claim, a statement of pure opinion cannot."[18] Nonetheless, as we noted in *Guilford Transp. Indus.,* "'statements of opinion can be actionable if they

imply a provably false fact, or rely upon stated facts that are provably false.'"[19] Thus, a statement of opinion is actionable if—but only if—"'it has an explicit or implicit factual foundation and is therefore objectively verifiable.'"[20] On the other hand, "'if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.'"[21]

## V. Whether AIPAC's Allegedly Defamatory Statement Was "Provably False"

■ Rosen argues that Dorton's statement in the March 3, 2008 *New York Times* that AIPAC "still held" the view that Rosen's "behavior 'did not comport with the standards that AIPAC expects of its employees'" was a statement both false and defamatory. AIPAC, he contends, "did not dismiss Rosen for behavior not comporting with AIPAC standards" because "AIPAC had no such standards." Inherent in Rosen's contention is the following proposition: if AIPAC did have the referenced "standards," they are provable as facts, warranting a trial rather than summary judgment; but if AIPAC did not have provable standards on which it relied to fire Rosen—as Rosen believes a trial would show—the falsity of AIPAC's state-

---

**13.** *Oparaugo v. Watts,* 884 A.2d 63, 76 (D.C. 2005).

**14.** *McBride v. Merrell Dow and Pharm., Inc.,* 540 F.Supp. 1252, 1254 (D.D.C.1982) (quoting *Olinger v. American Sav. and Loan Ass'n,* 133 U.S.App.D.C. 107, 109, 409 F.2d 142, 144 (1969)), *rev'd in part on other grounds,* 230 U.S.App.D.C. 403, 717 F.2d 1460 (1983).

**15.** *Howard Univ. v. Best,* 484 A.2d 958, 989 (D.C.1984) (quoting *Johnson v. Johnson Publishing Co.,* 271 A.2d 696, 697 (D.C.1970)).

**16.** *Guilford Transp. Indus. v. Wilner,* 760 A.2d 580, 597 (D.C.2000).

**17.** *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

**18.** *Gibson v. Boy Scouts of Am.,* 360 F.Supp.2d 776, 781 (E.D.Va.2005).

**19.** 760 A.2d at 597 (quoting *Moldea v. New York Times Co.,* 306 U.S.App.D.C. 1, 5, 22 F.3d 310, 313 (1994)).

**20.** *Id.* at 597 (quoting *Washington v. Smith,* 317 U.S.App.D.C. 79, 80, 80 F.3d 555, 556 (1996)).

**21.** *Id.* (quoting *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993)).

ment would be clear and its defamatory impact demonstrable.[22]

In response to Rosen's argument, the trial court concluded, based on the pleadings and discovery, that the challenged statement "does not rest on any objectively verifiable facts"; it "does not implicate any discernable objective standard." Thus, the statement was not "provably false," and summary judgment was accordingly warranted. We agree, but a detailed explanation is required.

AIPAC, as the party moving for summary judgment, must satisfy the initial burden of producing evidence, derived from discovery, "showing an absence of proof on one or more essential elements" of Rosen's claim.[23] To satisfy that burden, for example, AIPAC could cite evidence that Rosen had failed to show that the "standards" for employee conduct referred to in AIPAC's statement were "provably false." If AIPAC were able to do so, then the burden would shift to Rosen to avoid summary judgment by designating " 'specific facts,' " taken from his own affidavits or the " 'depositions, answers to interrogatories, and admissions on file,' " showing a genuine issue of fact warranting a trial.[24]

Or, as Rosen put it in his brief, he would have to identify specific evidence establishing "[w]hether AIPAC had standards and whether Rosen violated those standards." Rosen acknowledges, moreover, that the answers to those questions would have to be "objectively verifiable."

At this point, further discussion of the burdens of production and proof will be unnecessary until we have explored what the record—and especially the deposition testimony—reveals. Focusing on his central argument, Rosen stresses that the record reveals the absence of "written 'standards' of employee behavior" that Rosen is supposed to have violated-specifically, written "standards for receiving or handling classified information." Rosen is correct about the absence of written standards. According to AIPAC's Deputy Executive Director, Richard Lee Fishman, on deposition, AIPAC concedes there were no written standards for employee behavior at the time of the 2005 statement that AIPAC's 2008 statement incorporates.[25] According to Fishman, however, there was an unwritten, "assumed standard that people would obey the law ... [w]ith regard to classified information or any other ille-

---

**22.** In his complaint, Rosen alleged that AIPAC fired him after federal prosecutors insisted that AIPAC abide by a Justice Department memorandum (the so-called "Thompson Memorandum" of January 20, 2003) entitled "Principles of Federal Prosecution of Business Organizations" prescribing criteria for federal prosecution of corporations for the alleged misdeeds of its employees. According to Rosen's complaint, the criteria call for "the firing of the corporate employees who allegedly engaged in the wrongdoing, condemning their actions publicly, ending payments toward their legal costs, and denying them substantial severance payments." Rosen alleged that AIPAC complied with these directives in order to curry favor with the Justice Department and avoid prosecution, even though its Board "knew absolutely that Steven Rosen had done nothing wrong, indeed, nothing which they had not known about and author-

ized." Rosen does not allege, however, and does not argue on appeal, that this motive he attributes to AIPAC is germane to determining whether AIPAC's challenged statement is false and defamatory.

**23.** *Mixon v. Washington Metro. Area Transit Auth.*, 959 A.2d 55, 57 (D.C.2008).

**24.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED.R.CIV.P. 56); *see Cormier v. District of Columbia Water & Sewer Auth.*, 959 A.2d 658, 664 (D.C.2008) (D.C. "Super. Ct. R. Civ. P. 56 should be construed consistently with its federal counterpart," Fed.R.Civ.P. 56.).

**25.** AIPAC had a written computer usage policy, but Rosen does not contend that this is a "standard" at issue.

gal activity." In addition, when discussing Rosen's delayed report to AIPAC's general counsel about the FBI confrontation, and later in elaborating on Rosen's secretive relationship with his DOD contact, AIPAC's Executive Director, Howard Kohr, identified two standards—adherence to "counsel's advice" and communication with "total candor"—among the unwritten "standards of AIPAC employees" in 2005. Thus, Rosen is left with the contention that, if the case went to trial, the evidence would yield a genuine issue of fact as to whether Rosen violated "standards" that were unwritten but "assumed" and yet—to satisfy the law of defamation—"objectively verifiable." [26]

That contention presents this problem for Rosen: the challenged statement refers not to standards of a particular kind, identifiable in writing, but merely to "standards"—a general term capable of multiple meanings (*e.g.*, "obey the law," follow "counsel's advice," speak with "total candor") that communicates no specific message about a discernible fact to an uninformed hearer. And that one word, "standards," cannot necessarily—indeed, cannot "provably"—be understood to mean, for example, criteria for "receiving or handling classified information." As the trial court concluded:

> [I]t is not clear from the statement, or the context in which it was made, that the allusion to "standards AIPAC expects of its employees" refers in particular to standards concerning the receipt, handling, and dissemination of classified information. The referenced "stan-

dards" could just as easily refer to AIPAC's expectation that its employees not be charged with crimes, or the more subjective and amorphous expectation that its employees not cause undue embarrassment.

Persuasive case law supports the trial court's understanding. In *McClure v. American Family Mut. Ins. Co.*,[27] the defendant insurance company fired two insurance agents for engaging in lobbying activities that were "prejudicial to the company." As in the present case, the agents' terminations were reported to the press. The company's statements were "to the effect that appellants had engaged in 'disloyal and disruptive activity,'" that they had not understood the "'value of loyalty and keeping promises,'" that they had acted "'against the best interests of the insurance buying public,'" that they "'were in direct violation of their agreements,'" and that they had engaged in "'conduct unacceptable by any business standard.'"[28] Such statements, the court said, "are not sufficiently precise or verifiable to support a claim of defamation."[29] The court concluded, as the trial judge did here, that "remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because as a matter of law no threshold showing of 'falsity' is possible in such circumstances."[30]

Other case law makes the same point. In *Gibson v. Boy Scouts of Am.*,[31] the Boy Scouts revoked appellant's relationship with the organization and published a statement that he was "unfit to be a Scout-

---

**26.** *Guilford Transp. Indus. v. Wilner,* 760 A.2d 580, 597 (D.C.2000) (quoting *Washington,* 317 U.S.App.D.C. at 80, 80 F.3d at 556).

**27.** 223 F.3d 845, 856 (8th Cir.2000).

**28.** *Id.* at 853.

**29.** *Id.*

**30.** *Id.* (quoting *Hunter v. Hartman,* 545 N.W.2d 699, 707 (Minn.Ct.App.1996) (citing *Bose Corp. v. Consumers Union,* 466 U.S. 485, 512–13, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984))).

**31.** 360 F.Supp.2d 776 (E.D.Va.2005).

master and in Scouts." [32]  The appellant sued, among other claims, for defamation. The court held "that the statement that [the appellant] was 'unfit to be a Scoutmaster and in Scouts' does not contain a provably false factual connotation." [33]  The court accordingly concluded that those "allegedly defamatory words are merely the expression of the speaker's opinion, and do not state a claim of defamation for which relief can be granted." [34]

There may have been specific incidents buried in the words used by the employers in *McClure* ("disloyal," "disruptive," "loyalty," "keeping promises," "unacceptable," "best interests") and in *Gibson* ("unfit"). And if such incidents had been mentioned in the employers' statements, those incidents might well have been challenged for their claimed veracity and the statement found to be "provably false." [35]  But no one learned of particular incidents from the words used. And thus no one hearing the general characterizations used by the employers could have discerned particular behaviors that were concrete enough to reveal "objectively verifiable" [36] falsehoods.

The language in each exuded merely a subjective evaluation—essentially a "statement of opinion" without an "explicit or implicit factual foundation." [37]

In the present case, as noted earlier, the event that triggered Rosen's dismissal was the recommendation of outside counsel, Nathan Lewin. After receiving confidential information from federal prosecutors involved in a publicly revealed investigation of Rosen and an AIPAC colleague, Lewin counseled AIPAC in March 2005 to fire Rosen for "activity that AIPAC cannot condone." Rosen was fired a week later, followed the next month by AIPAC's statement of April 21, 2005 indirectly at issue here.

After appellee Dorton made AIPAC's April 21, 2005 statement, AIPAC learned much more about Rosen, as explained above and summarized here for reference. First, it learned that on August 4, 2005, Rosen was indicted on one count of "Conspiracy to Communicate National Defense Information" and one count of "Communication of National Defense Information."

**32.** *Id.* at 781.

**33.** *Id.*

**34.** *Id.; see also Osterberg v. Sears*, 2004 WL 2186407, *3, 2004 U.S. Dist. LEXIS 19093, *8 (D.Minn. Sept. 22, 2004) (holding employer's statement that employee was fired because of "ethical concerns and disregard for company policies and procedures" was not provably false); *but see Clark v. Schuylerville Cent. School Dist.*, 24 A.D.3d 1162, 807 N.Y.S.2d 175, 175 (N.Y.App.Div.2005) (holding principal's statement that teacher violated district's policy against showing "R" rated movies to students had precise meaning that was capable of being proved true or false).

Rosen cites *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 575 S.E.2d 858 (2003) to support his argument that "generalized statements about a terminated employee are provably false." In *Fuste*, the employer stated that two physicians had "abandoned their patients." *Id.* at 862. The court held

that "the term 'abandon' has a particular connotation in the context of a doctor's professional responsibility to a patient," and thus that "the statement that [the physicians] 'abandoned' their patients [was] demonstrably true or false." *Id.* In the present case, however, the statement that AIPAC "still held the view" that Rosen's "behavior 'did not comport with the standards that AIPAC expects of its employees'" does not have the same "particular connotation," *id.*, in the context of Rosen's employment at AIPAC as abandonment of patients has in the medical profession. Rosen's reliance on *Fuste*, therefore, is misplaced.

**35.** *Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 597 (D.C.2000) (quoting *Moldea*, 306 U.S.App.D.C. at 4, 22 F.3d at 313).

**36.** *Id.* (quoting *Washington*, 317 U.S.App.D.C. at 80, 80 F.3d at 556).

**37.** *Id.*

The Superceding Indictment reveals alleged criminal activity by Rosen dating back to 1999. Second, AIPAC learned from the indictment that after Rosen's verbal altercation with FBI agents at his home in August, 2004, he had not reported directly to AIPAC's general counsel after counsel had asked Rosen (in Rosen's words) to "convene in the office with him." Instead, despite the obvious urgency of the situation to AIPAC, Rosen admitted on deposition that he had chosen to meet first with an Israeli embassy official at a local restaurant because of an FBI allegation "extremely serious" for "some Israeli." Finally, AIPAC learned that Rosen had not revealed to his superiors the full extent of his relationship with his DOD contact: the U.S. government official from whom he allegedly had received classified information when the matter initially arose in 2004.

Accordingly, AIPAC's statement that in 2008 it "still held" the view that it had expressed in 2005—that Rosen's "behavior 'did not comport with the standards that AIPAC expects of its employees'"—is a statement based on significantly more information about Rosen's activities, particularly in 2004 and early 2005, than AIPAC was aware of in April 2005 when the statement was first made. This augmented file of information, based on deposition testimony, is relevant, first, to identify Rosen's pre-April 2005 behaviors which AIPAC discovered *after* making its April 2005 statement; and, second, to explain AIPAC's reactions to those early behaviors three years later—including its explanation of AIPAC's "standards" that generated those reactions. This deposition evidence, as elaborated earlier, reveals only unwritten, subjective—called "assumed"—standards of conduct that AIPAC expected of its employees in 2005. (It also makes clear why AIPAC "still held" the view that it expressed in 2008.)

Therefore, this deposition evidence reveals why AIPAC's March 3, 2008 statement is not "provably false." [38] Whatever collection of unwritten "standards" AIPAC may have had in 2005, each was too subjective, too amorphous, too susceptible of multiple interpretations—as explained in our discussion of *McClure* and *Gibson*—to make any of them susceptible to proof of particular, articulable content. And thus AIPAC's "standards"—a word of aggregation expressing an even higher level of generality—could have meant many things, none self-evident, and certainly none specifically directed at "receiving or handling classified information," Rosen's central focus in bringing this lawsuit.

In arriving at our decision, we have been mindful that AIPAC had the initial burden to present evidence that Rosen had failed to prove an "essential element[ ]" of his claim. [39] We conclude that AIPAC sustained that initial burden, first, by conceding through its officers' depositions that AIPAC lacked written "standards," and then by proffering, instead, the existence of various general standards that AIPAC employees are "assumed" to follow, such as "obey the law," follow "counsel's advice," speak with "total candor," that by their very generality and diversity convey no particular message. AIPAC therefore cited record evidence that Rosen had not been able to show that AIPAC's statement of March 3, 2008 relied on "stated facts" that were " 'provably false.' " [40]

**38.** *Guilford Transp. Indus.*, 760 A.2d at 597 (quoting *Moldea*, 306 U.S.App.D.C. at 4, 22 F.3d at 313).

**39.** *Mixon v. Washington Metro. Area Transit Auth.*, 959 A.2d 55, 57 (D.C.2008).

**40.** *Guilford Transp. Indus.*, 760 A.2d at 597 (quoting *Moldea*, 306 U.S.App.D.C. at 4, 22 F.3d at 313).

The burden then shifted to Rosen to show through the designated categories of discovery (in Rosen's case, his deposition) the "'specific facts'" that created a genuine issue of material fact for trial.[41] Rosen did not do so. As we have seen by quoting Rosen's responses to questions at his deposition, he either confirmed or failed to dispute the testimony that two high-ranking AIPAC officials, Richard Lee Fishman and Howard Kohr, gave to establish that AIPAC's "standards" for employee conduct were unwritten, capable of multiple, unspecified meanings, and thus—especially because they were identified only by one general, collective word—were not "provably false." In sum, no genuine issue of material fact remained for trial, and, for the reasons elaborated in this opinion, AIPAC is entitled to judgment as a matter of law.

*Affirmed.*

---

**41.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED.R.CIV.P. 56).