**William G. McBRIDE, Plaintiff,**

v.

**MERRELL DOW AND PHARMACEUTICALS, INC., et al., Defendants.**

Civ. A. No. 81–2639.

United States District Court, District of Columbia.

June 8, 1982.

Allen T. Eaton, Thomas H. Tate, Eaton & Tate, Washington, D. C., for plaintiff.

H. Thomas Howell, Washington, D. C., for Merrell Dow & Pharmaceuticals; Frederic D. Lamb and Robert Irvini.

Robert X. Perry, Jr., Washington, D. C., for American Association for the Advancement of Science and Gina Bari Kolata.

## MEMORANDUM OPINION AND ORDER

BARRINGTON D. PARKER, District Judge:

Plaintiff in this action claims that he was defamed by an article appearing in *Science* magazine in October 1980. The article entitled "How Safe is Bendectin?", discussed the plaintiff's involvement in a controversy surrounding a drug called Bendectin. The defendants include the American Association for the Advancement of Science, which publishes *Science* magazine; the article's author, Gina Bari Kolata; Merrell Dow Pharmaceuticals, Inc., manufacturer of the drug; and two public relations officers at Merrell Dow.

The defendants have moved to dismiss on several grounds, including failure to state a claim on which relief can be granted.[1]

---

1. The defendants also claim that personal jurisdiction over the two individual defendants is lacking, that the suit is barred by the applicable statute of limitations, and that the suit should be stayed because an identical complaint is

They assert that nothing in the publication can be construed as defamatory. This Court, for the reasons set forth below, agrees with the defendants and dismisses this action.

### Background

The background of this motion may be briefly stated. Bendectin, a drug taken for morning sickness in pregnancy, has been on the market for about 25 years. It is produced by one of the defendants, Merrell Dow Pharmaceuticals, Inc. In the last few years, several researchers have raised doubts about the drug's safety, and a number of civil lawsuits have been filed against the manufacturer. The plaintiff, one of the leading critics of the drug, testified at a highly publicized trial of one such suit in Orlando, Florida in January 1980.

In light of the controversy over the drug, the Food and Drug Administration held hearings in September 1980. The plaintiff testified at those hearings and stated that the drug is not safe and that it caused birth defects. A reporter for *Science* magazine, Gina Kolata, covered the hearings and wrote a story describing them and the background of the Bendectin controversy. The article included the following passage:

> These expert witnesses included William McBride of the Women's Hospital in Sydney, Australia, who was paid $5,000 a day to testify in Orlando. In contrast, Richardson-Merrell [a.k.a. Merrell-Dow] pays witnesses $250 to $500 a day, and the most it has ever paid is $1,000 a day. McBride was one of the first to suspect that Thalidomide caused birth defects. He contends that Bendectin, too, causes deformed arms and legs, and he said at the trial that, in his opinion, Bendectin caused [Orlando, Florida plaintiff] David Mekdeci's malformations. For much of his talk at the FDA meeting, McBride dwelt on the effects of Thalidomide, lead-

ing [FDA panel member] Avery to say, "Dr. McBride, you have convinced me that Thalidomide is a teratogen but I must in my own mind focus on the drugs that are in Bendectin."

The plaintiff alleges that three portions of the article are defamatory. First, plaintiff asserts that the article contained a statement to the effect that Dr. McBride "was a witness for the much-publicized Melvin Belli at the FDA hearing."[2] It is alleged that this statement was untrue, because "Dr. McBride does not know and in fact has never met or talked to the lawyer mentioned in the article."[3] Second, he states that he is never paid "$5,000 a day" to testify, as the above paragraph states, and that such a statement suggests that Dr. McBride and his supporters "are interested not in the truth but are motivated only for invidious and selfish reasons."[4] Finally, he asserts that the comment attributed to panel member Avery in the above passage "was made to indicate to the general public that Dr. McBride did not know what he was talking about."[5]

### Legal Analysis

In this jurisdiction, a publication is considered defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Olinger v. American Savings & Loan Association*, 409 F.2d 142, 144 (D.C.Cir.1969). The allegedly defamatory remark, however, must be more than merely unpleasant or offensive; the language must make the plaintiff appear "odious, infamous, or ridiculous." *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 697 (D.C.1970), *citing Chaloner v. Washington Post Co.*, 36 App.D.C. 231, 233, *rev'd on other grounds*, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987 (1911); *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 83 (D.C.1980), *cert. denied*, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981). Whether a communica-

pending in the Superior Court of the District of Columbia (C.A. 12264–81).

**2.** Complaint, ¶ 13(a).

**3.** *Id.*

**4.** *Id.* at ¶ 13(b).

**5.** *Id.* at ¶ 13(c).

tion is capable of bearing a defamatory meaning is a legal issue to be decided by the court. *Harrison v. Washington Post Co.,* 391 A.2d 781 (D.C.1978); Restatement (Second) of Torts § 614 (1977).

■ With the foregoing standard in mind, nothing in the article is found capable of bearing a defamatory meaning. The first and third allegations of the complaint can be readily dismissed. It is farfetched at best to claim that Avery's comments on the testimony implied that Dr. McBride is "ignorant" of his subject matter. Avery merely remarked that McBride's scientific analysis was unconvincing. But even if Avery had directly stated that the plaintiff is ignorant of his subject matter, such a statement would properly be considered a non-defamatory statement of opinion. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974); *Ollman v. Evans,* 479 F.Supp. 292, 293 (D.D.C.1979). Moreover, the plaintiff does not claim that Avery was misquoted, and the first amendment imposes a barrier to a defamation suit for an accurate quotation of a public official. *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 120, 122 (2d Cir.) *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

■ The plaintiff's claim of libel based on the reference to Melvin Belli is even more uncompelling. There is nothing defamatory in the article's erroneous implication that Dr. McBride was called as a witness for Belli in the Florida trial. Although the article called Belli "flamboyant," that adjective does not imply any improper conduct by Belli. The court recognizes that Belli is a controversial figure in the legal profession. *See In re Belli,* 371 F.Supp. 111 (D.D.C.1974). However, an expert witness' mere association with such a person cannot be construed as defamatory. *Cf. Prucha v. Weiss,* 233 Md. 479, 485–86, 197 A.2d 253, 257 (1964) (finding no libel when newspaper erroneously reported that a controversial

politician supported the plaintiff's candidacy for public office).

■ The allegation regarding Dr. McBride's rate of remuneration requires a more extensive discussion. A statement that Dr. McBride was paid $5,000 a day for his testimony as an expert in the Orlando trial could not, standing alone, be considered defamatory. A high level of remuneration suggests, if anything, a high degree of professional accomplishment. The plaintiff, however, claims that because the plaintiff, according to the article, was paid more than other expert witnesses, the article implies that Dr. McBride "is willing to prostitute his professional expertise and testify on behalf of the highest bidder." [6]

The inference is improbable. The article clearly indicates that Dr. McBride is an expert in this area and not a "prostitute." The article recognizes that McBride made an important scientific contribution as "one of the first to suspect that thalidomide caused birth defects." Moreover, the innuendo drawn by the plaintiff is undermined by his own admission that although he was not paid $5,000 per day, he was, in fact, paid $1,116 per day. No other expert witness, according to the article, was paid more than $1,000 per day. Thus, even the plaintiff concedes that he received a higher rate of remuneration than any other expert witness in the Orlando trial.

Dean Prosser has written that defamation "necessarily ... involves the idea of disgrace." W. Prosser, *Law of Torts,* 739 (4th ed. 1971). Courts, in this jurisdiction and elsewhere, have frequently dismissed complaints which fail to meet such a requirement. For example, in *Sullivan v. Meyer,* 91 F.2d 301 (D.C.Cir.1937), plaintiff, who sought the elimination of "anti-patriotic or pro-communistic matter" in the public schools, was portrayed in a *Washington Post* article as involved in a "farcical" campaign to "prevent pupils knowing anything about Russia." The court dismissed the complaint, holding that the article was not defamatory in that it did not subject plain-

6. *Id.* at ¶ 21.

tiff to "public ridicule and contempt." *Id. at 302. See also Levy v. American Mutual Liability Insurance Co.*, 196 A.2d 475 (D.C. 1964) (holding that insurance company's report, which erroneously implied that plaintiff was accident-prone and hence a bad insurance risk, was not defamatory). The mere allegation that plaintiff was paid considerably more than other expert witnesses in a civil trial cannot, in this Court's view, be considered "disgraceful." [7]

For the reasons set forth above, the motions of the defendants to dismiss the complaint should be granted.[8]

---

[7.] In opposition to the defendants' motion to dismiss, the plaintiff attached the affidavit of Elizabeth Loftus. She states in her affidavit that she is a professor of psychology at the University of Washington who has performed much research in "the meaning conveyed by words and sentences." In her view, a "substantial minority of readers" of the Bendectin article were likely to conclude that Dr. McBride's testimony was influenced by the amount of money that he was paid. As the above discussion makes clear, however, the court, not the jury, decides whether a particular statement is capable of bearing a defamatory meaning. Ms. Loftus' affidavit, in effect, expresses her legal opinion, and its submission is therefore inappropriate. *See* Rule 56(e); *Thompson v. Evening Star Newspaper Co.*, 394 F.2d 774 (D.C.Cir.), *cert. denied*, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968).

[8.] In light of this ruling, it is not necessary to address the other issues raised by the defendants in their motions to dismiss.