William G. McBRIDE, M.D., Plaintiff,

v.

**MERRELL DOW AND PHARMACEUTICALS, INC., et al., Defendants.**

**Civ. A. No. 81–2639.**

United States District Court,
District of Columbia.

June 13, 1985.

Allen T. Eaton, W. David Allen, Allen T. Eaton & Associates, Washington, D.C., for plaintiff.

Robert X. Perry, Jr., Wilkes, Artis, Hedrick & Lane, H. Thomas Howell, Sidney G. Leech, Semmes, Bowen & Semmes, Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This defamation action comes before the Court on the parties' cross-motions for summary judgment following remand from the Court of Appeals. The action arises from the publication of an article entitled "How Safe Is Bendectin?" in *Science* magazine on October 31, 1980. The Court of Appeals affirmed in part and reversed in part this Court's initial decision dismissing the plaintiff's complaint for failure to state a cause of action. *McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 717 F.2d 1460, 1467 (D.C.Cir.1983). The text of the article is attached to this opinion as Appendix A. This Court had dismissed the complaint after holding that "nothing in the article is found capable of bearing a defamatory meaning." 540 F.Supp. 1252, 1255 (D.D.C. 1982). With respect to all but one of the allegedly defamatory statements, the Court of Appeals agreed. 717 F.2d at 1464–65. The Court of Appeals noted that it was "troubled" by improbability of this single

remaining claim, *id.* at 1461, 1466 and suggested that this Court

> proceed upon remand in a manner that will minimize, so far as practicable, the burden a possibly meritless claim is capable of imposing upon free and vigorous journalism.

*Id.* at 1462. With these remarks in mind, the Court will briefly discuss the background of this litigation,[1] the Court of Appeals' holding in light of the questions which must be decided on remand, and the reasons supporting the conclusion that the plaintiff cannot as a matter of law prevail in this action.

## A.

### FACTUAL BACKGROUND

The plaintiff in this action is Dr. William G. McBride, a world-renowned expert in the field of teratology, the study of birth defects. Complaint at ¶¶ 1, 13. Dr. McBride, an Australian, first acquired his reputation through research directed at the relationship between the drug thalidomide and certain birth defects. The *Science* article was published after Dr. McBride's trip to the United States to testify before the Food and Drug Administration ("FDA") about the safety of another drug, Bendectin, which has also been associated with certain birth defects. The hearing took place several months after Dr. McBride testified as an expert witness on behalf of the plaintiffs in an Orlando, Florida lawsuit which sought recovery for birth defects allegedly caused by the use of Bendectin. *Mekdeci v. Merrell National Laboratories,* No. 77–255 (M.D.Fla.).[2]

In connection with a general discussion about the safety of Bendectin, the *Science* article made several assertions about the various experts who testified both for the plaintiffs at the *Mekdeci* trial and before the FDA panel. With respect to Dr. McBride, the article stated, among other things, that he

> was paid $5,000 a day to testify in Orlando. In contrast, Richardson-Merrell, pays witnesses $250 to $500 a day, and the most it has ever paid is $1,000 a day.

Although several statements about Dr. McBride were challenged as defamatory, the witness fee statement is the only assertion which survives the Court of Appeals' ruling.

The defendants in this litigation are Gina Bari Kolata, the author of the article, the American Association for the Advancement of Science ("the Association"), the publisher of Science magazine, three Merrell Dow corporate entities, the manufacturer of Bendectin, Frederic Lamb, Merrell Dow's general counsel, and Robert Irvine, a public relations officer at Merrell Dow.[3] Ms. Kolata and the Association are charged with responsibility for the witness fee statement and its dissemination. The complaint against the individual and corporate Merrell Dow defendants rests on two grounds: statements made during alleged communications with Ms. Kolata and subsequent dissemination of the article. Specifically, the complaint alleges that defendant Irvine, at the behest of his employer and Lamb, "spread lies and deceit" to Ms. Kolata, Complaint ¶ 8, and that Merrell Dow "plant[ed] [ ] false and scurrilous statements" in the article. *Id.,* ¶ 13. After remand, the only possibly actionable statement which can be attributed to Merrell Dow is their alleged statement that they

---

**1.** Since the pertinent background of this litigation is discussed in great detail in the previous decision of this Court and the Court of Appeals' decision, it will not be repeated in full here.

**2.** The history of the *Mekdeci* case is described in the Eleventh Circuit opinion affirming the judgment in favor of the defendant. *Mekdeci v. Merrell National Laboratories,* 711 F.2d 1510 (11th Cir.1983). Incidentally, the plaintiff's counsel in this case was one of several counsel for the plaintiffs in *Mekdeci.*

**3.** The corporate Merrell-Dow defendants include Merrell-Dow and Pharmaceuticals, Inc., Richardson-Merrell, Inc., and Merrell National Laboratories, Inc. These entities, along with Lamb and Irvine, are collectively referred to as the "Merrell Dow" defendants. Merrell National Laboratories was the defendant in the *Mekdeci* case.

generally paid their experts $250–$500 a day to testify, and had never paid an expert more than $1,000 per day. *Id.*, ¶ 13(b).

In contrast, the complaint does not assign responsibility for the statement about Dr. McBride's remuneration to Merrell Dow. Although the source of this statement is not alleged in the complaint, *id.*, it is apparently based on the remarks of Melvin Belli, an attorney of record in the *Mekdeci* case. The Court of Appeals referred to public statements made by Belli that "[i]t cost me $5,000 a day to bring [Dr. McBride] to the Mekdeci case," and "[w]e've got a guy, McBride, here from Australia, $5,000 a day." 717 F.2d at 1464 n. 6 (citations omitted).

The complaint further alleges that Merrell Dow subsequently disseminated the article "as part of its scheme to silence plaintiff, indoctrinate the scientific community and avoid or stall access to the courts for maimed babies." Complaint ¶ 12. The activities of all the defendants were allegedly done "with actual malice." *Id.*, ¶ 22.

### B.

### THE COURT OF APPEALS OPINION

As already noted, the Court of Appeals held that only the witness fee statement could possibly state a claim upon which relief can be granted. It opined that:

> [i]t is not possible for us to conclude, however, that the published statement that McBride was paid $5,000 a day to testify in the Florida trial, particularly when directly compared with the amounts Merrell Dow paid its expert witnesses, is incapable of bearing a defamatory meaning.

717 F.2d at 1465. The Court cautioned that in the event the plaintiff is found to be a public figure, he must prove actual malice in order to prevail.[4] The Court gave its opinion that

> [t]hough the district court did not rule upon the point and we do not foreclose

any decision that court may make after briefing and argument, we think it highly likely, in the context in which this case arises, at least, that Dr. McBride is a [limited] public figure.

*Id.* at 1466.

Finally, the Court urged that if the plaintiff was determined to be a public figure, discovery after remand should, at least initially, be confined to issues which might support summary disposition of the case. This is because "suits—particularly those bordering on the frivolous—should be controlled so as to minimize their adverse impact upon press freedom." This Court construes these remarks to mean that if Dr. McBride is a public figure, the question of actual malice might be decided on summary judgment.

This Court thus directed that discovery be limited initially to two issues which, taken together, might support summary judgment. First, the Court directed the parties to explore Dr. McBride's status as a public figure. Second, the Court permitted discovery on the question of the fee Dr. McBride earned in the Florida trial. It was anticipated that both of these inquiries would shed some light on the issue of whether Dr. McBride could ultimately prevail at trial on the question of actual malice.

In limiting the scope of discovery on remand, the Court relied in part on the Court of Appeals' statement that "[s]hould the district court rule that McBride is a public figure, the sense in which the fee statement is true would make it extremely difficult, if not impossible, to prove actual malice." (Memorandum Order denying rehearing en banc, filed Feb. 22, 1984). Normally, the question of the truth of a statement should be decided by the jury, and the question of actual malice should only be resolved after conducting an inquiry into the state of mind of the author. Here, however, the resolution of the first question, coupled with the special circumstances

---

**4.** The Court did not distinguish between the liability of the media and the nonmedia defendants. This Court understands the actual malice standard to apply to media defendants. *See* discussion *infra* at 1353–54, 1356.

of this case, makes discovery specifically directed to actual malice burdensome and unnecessary. Based on the proceedings conducted after remand, the Court concludes that summary judgment for the defendants is warranted.

## C.

## DETERMINATIONS AFTER REMAND

### Public Figure Status

■ Defamation law recognizes two types of public figures: general and limited public figures. A general or all-purpose public figure is a person who enjoys "general fame or notoriety in the community." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351–52, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974). In contrast, a limited-purpose public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." *Id.* at 351, 94 S.Ct. at 3013. After considering these standards, the Court rejects the defendants' suggestion that Dr. McBride may have acquired the status of a general public figure, but agrees that he is a limited public figure for purposes of this litigation.

■ The decision in *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980) sets out the appropriate framework for the limited public figure analysis. It directs the Court to determine whether a public controversy exists, examine the nature of the plaintiff's role in the controversy, and consider whether the alleged defamation was relevant to the controversy. *Id.* at 1296–98. Prototypical public figures are those individuals who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved ... [t]hey invite attention and comment." *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009.

■ After applying this test, the Court has little difficulty concluding that Dr. McBride was a limited-purpose public figure in the context of the Bendectin controversy. First, there was in fact a rather heated public controversy surrounding the safety of Bendectin and its role in causing birth defects. The highly-publicized Florida litigation and the controversial FDA hearings provide two of many examples of the turmoil following the manufacture of the drug. The hundreds of pages of exhibits accompanying the defendants' motion for summary judgment demonstrate the wide publicity afforded the controversy and the emotional nature of the issues which were aired. *See* Ex. A, filed Aug. 17, 1984. These submissions demonstrate that the manufacture of Bendectin provoked a far-ranging public controversy.[5]

Second, Dr. McBride played a significant role in the Benedectin controversy, a role which was entirely voluntary. Moreover, the role he chose to play in the controversy was one designed to affect the outcome of the public debate. *See Waldbaum,* 627 F.2d at 1298. Dr. McBride could hardly have agreed to testify at the Orlando trial and the FDA hearing without intending that his testimony would, to a significant degree, color the public's perceptions about the safety of Bendectin.

■ Nevertheless, McBride argues that he is not a public figure for purposes of the Benedectin controversy. He asserts that he has had no contact with the United States media, and that he has never sought to influence public opinion through the media. Affidavit, Plaintiff's Ex. (PX) A, filed Sept. 24, 1984. Even so, Dr. McBride should have been aware that both the media and the public would pay close attention to the Bendectin controversy, and that his role in that conflict might generate commentary "of a hurtful and perhaps unfair nature." 717 F.2d at 1466. Dr. McBride is no stranger to these risks. As one of the

---

5. The plaintiffs apparently concede this point, but attempt to minimize McBride's role in the controversy. *See* discussion *infra.*

fathers of teratology, McBride Dep. at 370–71, filed June 7, 1984, he was one of the central figures in the thalidomide controversy, and over the years he has spoken out about drugs and other agents that cause birth defects, including Bendectin. *See, e.g.,* Complaint ¶ 13; McBride Dep. at 364–66, 400–01, 413–14, 416, 420–22. He cannot now be heard to complain about the prominence of the role that he has chosen for himself, and the risks that he has voluntarily assumed.

### Actual Malice: Ms. Kolata and the Association

■ A public figure must prove actual malice in order to prevail against a media defendant. Actual malice means that the defendant had "knowledge of [the] falsity or showed reckless disregard for the truth," *McBride,* 717 F.2d at 1466 (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1963)), or put differently "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Actual malice must be established by clear and convincing evidence. *Bose Corp. v. Consumers Union of U.S. Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984).

■ The touchstone for this analysis is the state of mind of the defendants,[6] bearing in mind that "there is a significant difference between proof of actual malice and mere proof of falsity." *Id.* at 1965. The Court is well-aware of the recent admonition that "proof of 'actual malice' … does not readily lend itself to summary disposition." *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979). Nevertheless, several factors, highlighted by the record which has been developed in this case, justi-

fy the conclusion that a reasonable jury could only conclude that the media defendants lacked actual malice.

First, the nature of the statement concerning Dr. McBride's remuneration, taken alone, is neither literally true nor literally false. This is due to the rather unusual method of compensation which Dr. McBride received in the *Mekdeci* case. Although the reference to his expert witness fee is ostensibly a statement of fact, the statement is inevitably influenced by subjective perceptions which, as the Court of Appeals remarked, make it both correct and incorrect.

At oral argument, it was assumed that Dr. McBride received $5,000, including air fare, in return for his testimony. *McBride,* 717 F.2d at 1464. McBride believed this sum represented reimbursement for the 5 weekdays he was unable to attend to his Australian practice, at the rate of approximately $1,000 per day, excluding air fare, rather than compensation for one day of trial testimony.[7] As the Court of Appeals noted, however, an alternative interpretation of Dr. McBride's compensation makes the statement in a sense correct. *Id.* at 1465. This interpretation emphasizes what the *Mekdeci* plaintiffs received in return for their money: one day or less of trial testimony. It is for this reason that the statement is neither true nor false, and the defendants cannot be said to have acted with reckless disregard for the truth of a statement which was capable of such varying interpretations.

Although the plaintiff apparently concedes this point, he argues that the statement is false because it is juxtaposed with the assertion concerning the compensation paid the Merrell Dow experts. He argues that the statement conveys the impression that he was paid at least as much as five times for his services as the Merrell Dow

---

6. The Association, of course, does not possess a state of mind. It is thus the state of mind of the author—Kolata—which is relevant.

7. Subsequent facts elicited in discovery show that Dr. McBride vastly underestimated the fee he received in the *Mekdeci* case. Dr. McBride

has testified that he was compensated for the 13 weekdays he spent in the United States. McBride Dep. at 504–06. Moreover, the record now establishes that Dr. McBride testified for one-half day at the Orlando trial.

experts ($5,000 versus $1,000), despite the fact that their actual compensation was nearly equal. He submits the deposition testimony of Olli Heinonen, an expert for the defendant in the *Mekdeci* case, to show that Heinonen received approximately $800–$1,000 per day for his trial testimony, PX–B at 7, PX–C at 8, computed on the basis of the number of days he devoted to the *Mekdeci* litigation. Since Dr. McBride was also paid $1,000 a day for the weekdays he spent away from his practice in Australia, he argues that the rates of the two experts were in fact commensurate, and the impression conveyed by the *Science* article was false.

The Court agrees that the Heinonen testimony indicates that the compensation of the experts in the *Mekdeci* trial did not vary as much as the *Science* article implies. This implication, however, is not necessarily false. This is because the rates paid the two experts cannot be meaningfully compared. Dr. McBride was paid for the time he spent in the United States whether or not he spent that time working on the *Mekdeci* case; Dr. Heinonen was apparently paid based on the time he devoted to the case. Hindsight indicates that it would have been difficult to compare the two fee arrangements, and the comparison which Ms. Kolata attempted was not clearly false. Accordingly, the plaintiff's motion for summary judgment on the falsity of the witness fee statement is **denied.**

In any event, the ultimate question is not the truth or falsity of this comparison, but whether the statement could have been made with actual malice. The following scenario, which has been drawn from the complaint and the discovery conducted thus far, is relevant to this inquiry.

This scenario begins with the *Science* article, which compared the fees paid Dr. McBride in the *Mekdeci* case with the compensation received by experts who testified for Merrell Dow. The source for this statement was apparently twofold. Melvin Belli, one of the lawyers in the *Mekdeci* case, bragged that Dr. McBride was paid $5,000 per day. A representative of Merrell Dow

allegedly told Ms. Kolata that it had never paid its experts more than $1,000 per day, Complaint ¶ 13(b). The second half of this statement is openended, and presumably refers to the fees incurred in similar litigation involving birth defects.

The portion of the statement referring to Dr. McBride was not clearly false because it was capable of at least two interpretations, neither of which is clearly false. *See supra* at 1354–55. The portion of the statement about Merrell Dow's experts, whether or not it is true, is not defamatory of Dr. McBride because it makes no references to him. Taken together, the juxtaposition of the two halves of the statement may have created a misleading impression about Dr. McBride's fee schedule for the *Mekdeci* case. Nevertheless, an examination of the scenario described above, coupled with other relevant factors, demonstrates that neither Ms. Kolata nor the Association can be held liable for actual malice.

First, the "sense in which the fee statement is correct," *McBride,* 717 F.2d at 1465, coupled with the obvious difficulty of drawing any relevant comparisons in this confusing and rather complex area of expert reimbursement, negates a finding of actual malice. Dr. McBride himself has exhibited considerable confusion about the amount of money he received for his *Mekdeci* testimony and the number of workdays which were actually expended during his Orlando trip. Initially, he argued that he was reimbursed for a 5-day absence from Australia. His subsequent deposition testimony demonstrates that he was actually reimbursed for a 13-day absence. To complicate the matter even further, the plaintiffs have a proffered some evidence that Dr. McBride received compensation for 17 days during the *Mekdeci* trial, relying on a document unearthed after his deposition. Defendants' Ex. D–36.

These various estimates are at best confusing and conflicting. Four years after this litigation commenced, the truth about Dr. McBride's compensation is still unknown. This demonstrates the prepos-

terousness of a finding that Ms. Kolata could have acted with actual malice, when Dr. McBride was himself unsure about his remuneration.[8]

Second, other facets of the publication of the *Science* article show that no reasonable jury could find that the witness fee statement was a deliberate falsehood. The tenor of the article as a whole exhibits a commendable effort to present both sides of an extremely emotional controversy. While the article may have questioned the soundness of Dr. McBride's opinions about the safety of Bendectin, it cannot be characterized as an attack on Dr. McBride's reputation as a pioneer in the field of birth defect research. It is significant that Dr. McBride is referred to as "one of the first to suspect that Thalidomide caused birth defects." *McBride*, 717 F.2d at 1470. The article also notes Merrell Dow's responsibility for marketing the dangerous drug Thalidomide, *id.* at 1469, a statement which is hardly complimentary of the parties on the other side of the controversy. Thus, on balance, the article presents a fair picture of both sides of the Bendectin controversy and Dr. McBride's role in that controversy.

In addition, the Association complied with McBride's request that it publish a retraction of the witness fee statement. *See* Complaint, Exs. J, K. The retraction accurately reported Dr. McBride's interpretation of his reimbursement rate for the *Mekdeci* case. Interestingly, although Dr. McBride requested a wholesale retraction which essentially tracked the subsequent allegations of his complaint, the Association retracted only the witness fee statement. This statement, of course, is the only statement in the article which, in the opinion of the Court of Appeals, stated a claim upon which relief could be granted. Thus, the tenor of the article, coupled with the Association's entirely reasonable retraction, also lends support to the conclu-

sion that the article is not defamatory under the applicable constitutional standards.

### Merrell Dow defendants

Finally, the Court must consider the plaintiff's cause of action against the Merrell Dow defendants. Although the Court of Appeals did not specifically direct a separate inquiry into the status of these nonmedia defendants, such an inquiry is necessary because it is unclear whether the first amendment protections afforded media defendants apply to nonmedia defendants. *See Waldbaum*, 627 F.2d at 1291, 1293. In other words, if the complaint states a claim against the Merrell Dow defendants, a lack of actual malice on their part will not necessarily preclude liability for defamation. However, the question of the Merrell Dow defendants' state of mind need not be examined because the complaint, as written, fails to state a claim against them.

As already noted, the sole basis for the liability of the Merrell Dow defendants is the dissemination of the allegedly defamatory article to the American Medical Association, Merrell Dow managers, and various pharmacists. They are not alleged to have themselves made any defamatory statements about Dr. McBride. Thus, their liability is premised on their alleged "republication" of the article.

 Liability for dissemination of defamatory material is not openended. The courts have required a showing of special circumstances imposing a duty on the distributor to ascertain the defamatory character of the publication. *See Restatement (Second) of Torts* § 581; *Lerman v. Chuckleberry Publishing, Inc.*, 521 F.Supp. 228, 235 (S.D.N.Y.1981), *rev'd on other grounds*, 745 F.2d 123 (2d Cir.1984). This is to prevent the imposition of liability on an individual where he had no reason to know of any false statements. For in-

---

8. Moreover, although Ms. Kolata may have acted carelessly in juxtaposing the two halves of the witness fee statement, she could not have acted with actual malice unless she had some reason to doubt the accuracy of her sources of

information. This is a virtual impossibility, given the fact that Ms. Kolata relied on the representations of individuals who would presumably know the relevant facts.

stance, the owner of a newstand cannot be held liable for the sale of defamatory material for which he personally bore no responsibility, absent special circumstances.

Here, the complaint does not allege any circumstances which would support a finding of liability against Merrell Dow. The complaint and accompanying exhibits allege only that various Merrell Dow employees were responsible for the dissemination of the *Science* article. As a corporation, Merrell Dow can act only through its agents and employees, and their knowledge thus provides the only basis for a finding of liability. Of these individuals, only defendant Lamb, as the general counsel for Merrell Dow, could conceivably have any reason to know of the fees charged by Dr. McBride. This tangential connection to the *Mekdeci* litigation provides too tenuous a link on which to premise a claim for defamation. Under these circumstances, summary judgment should also be entered in favor of the Merrell Dow defendants.

## CONCLUSION

The Court determines that summary judgment should be entered in favor of all defendants, and **dismisses** the plaintiff's complaint with prejudice. The Court **denies** the defendants' request for an award of attorneys' fees as the prevailing parties. Although this lawsuit is indeed meritless, the Court of Appeals permitted the parties to explore certain issues on remand, and it would be inappropriate to punish the plaintiff for pursuing these opportunities. An appropriate Order accompanies this Memorandum Opinion.

## APPENDIX A

### How Safe Is Bendectin?

An FDA panel sees no evidence that it causes birth defects.

Lawyers say they will sue anyway

SCIENCE, VOL. 210, 31 OCTOBER 1980

The safety of Bendectin, a drug taken for morning sickness in pregnancy, has become the subject of an emotional and intense debate among parents, lawyers, and medical scientists. Lawyers claim Bendectin is a new thalidomide and are seeking women who took the drug and bore deformed children to join in lawsuits against Richardson-Merrell Inc., the drug's manufacturer. A number of scientists are saying that the drug has never been shown to be dangerous to fetuses and, in the absence of any such evidence, the lawsuits are unwarranted.

What is really at issue is the more subtle question of how safe is safe. Does lack of evidence that a drug is harmful mean that it is not? Can a manufacturer be held liable for damages when scientists say they have a "residual uncertainty" about a product's safety? These questions go far beyond the specifics of the Bendectin case and extend to virtually every drug and possibly toxic substance to which people are exposed. For this reason, the Bendectin story has become a symbol of the quandaries that arise when science is unable to provide definitive answers to questions of public health.

Bendectin is one of the more commonly used drugs during pregnancy. Richardson-Merrell estimates that 25 percent of pregnant women in the United States take the drug, and it is popular in other countries including Germany, Canada, and Great Britain. Some doctors, in fact, are said to hand out prescriptions for Bendectin along with prescriptions for prenatal vitamins.

Although Bendectin has been on the market for 23 years, doubts about its safety were voiced only in the past 2 years. They began in the medical community when Kenneth Rothman of the Harvard School of Public Health found a weak association between Bendectin and congenital heart defects. Last winter, the doubts about Bendectin reached the general public as a result of a highly publicized trial in Florida in which the flamboyant lawyer Melvin Belli represented the parents of a deformed boy whose mother had taken the drug.

In response to intense public interest in Bendectin, the Food and Drug Administra-

tion (FDA) moved up its scheduled hearings on the drug's safety from October to September. On 15 and 16 September, an FDA panel met in a hot, stuffy room crowded with lawyers to review animal data and 13 epidemiologic studies. It unanimously concluded that there is no demonstrated association between Bendectin and birth defects. However, the panel noted that because there is no way to prove absolute safety, there is a "residual uncertainty" about the drug's effects on fetuses.

The 13 studies reviewed by the FDA panel varied enormously in design and reliability, and most had an unresolvable limitation. Women were asked, usually after their babies were born, whether they had taken Bendectin. Hershel Jick of the Boston Collaborative Drug Surveillance Program observes that the "recall" method introduces an enormous problem of bias. Women with normal babies may forget they took the drug and those with malformed babies may be more likely to remember—or vice versa. The bias is essentially unmeasurable.

Only two studies circumvented this problem. One was done by Jick himself, who examined computerized medical records at the Group Health Cooperative at Puget Sound for nearly 6000 pregnant women, 40 percent of whom were accorded as filling Bendectin prescriptions. He saw no indication that the drug caused an increase in any particular birth defect, including those that have been suspected of being caused by Bendectin, such as limb deformities and cleft lips or cleft palates.

The other study that is free of recall bias is one by Richard W. Smithells of the University of Leeds in England. Smithells also gauged Bendectin use on the basis of filled prescriptions. He reports no evidence of an increase in birth defects in general or in any specific type of birth defect in 2,000 women who took the drug as compared to 11,000 women who did not.

Ralph D'Agostino, a statistician at Boston University and an FDA panel member, argues, however, that from a statistical point of view it is more valuable to look at data from studies that focus on specific defects and then see if women who gave birth to children with these defects are more likely to have taken Bendectin. The method of looking at a whole spectrum of birth defects usually yields small numbers of babies with particular defects. For example, Jick found only 12 babies with limb deformities in his sample.

Most of the studies that focused on particular birth defects showed no relation between the defects and Bendectin. Two teams of researchers looked at specific defects, however, and found a slight association with Bendectin use. In one study, led by Rothman, there were weak associations between heart defects and aspirin, antibiotics, and Bendectin. He describes his results as at best "exploratory," not to be taken as indicating that Bendectin causes heart defects. He mentions particularly the problem of recall bias, since women were given an open-ended questionnaire about drug use.

Jean Golding of the University of Bristol in England asked doctors what they had prescribed for mothers of babies with cleft lips or palates and for mothers of normal babies, and found that the number of reported Bendectin prescriptions was slightly higher for mothers of babies with these birth defects. But Golding is ambivalent about her results because of the bias introduced by her method of ascertaining Bendectin use.

In the end, the discussion of Bendectin's safety came down to reasoning that more studies have been done on Bendectin than on any other prescription or nonprescription drug taken by pregnant women and nothing has shown that the drug is dangerous. Scientists at the FDA meeting also said that every agent that is known to cause birth defects causes a recognizable syndrome. No such syndrome has been associated with Bendectin. Since 30 million pregnant women have taken the drug, Jick says, he "would find it a shocking fluke if something were going on with the drug that we have missed."

The FDA panel did express concern, however, that the drug was associated with birth defects in the studies of Golding and Rothman, even though these findings were not confirmed by other studies. The panel noted that Bendectin is probably overprescribed. Certainly, scientists at the meeting argued, if the drug is to be used only for intractable nausea and vomiting, 25 percent of the pregnant women in this country (and 40 percent in Puget Sound) should not be taking it. Panel member Brian Little, a professor of obstetrics and gynecology at Case Western Reserve University, estimated that fewer than 10 percent of pregnant women should require Bendectin.

Belli says the FDA panel's decisions will not deter the lawsuits pending against Richardson-Merrell. "We will not rely on the FDA at all. We're going ahead with our own proof [that Bendectin causes birth defects]," he declared. His proof consists of a list of women who took the drug during pregnancy and bore children with limb defects. In addition, Belli has his own expert witnesses. But epidemiologists say a list of deformed children is not proof. Every year, about 90,000 babies are born with serious birth defects, and 3,000 of them have limb defects. By chance alone, then, if 25 percent of pregnant women take Bendectin, 750 babies with limb defects should be born each year to women who took the drug.

To find such babies, Belli has placed ads in U.S. newspapers and has traveled to England and Germany. He says he is thus far suing Richardson-Merrell on behalf of 75 women and knows of at least 125 Bendectin lawsuits, in addition to his own, that are going to trial. A Richardson-Merrell spokesman says, however, that only 36 lawsuits have been filed.

The hundreds of millions of dollars riding on the Bendectin suits drew a crowd of lawyers to the FDA meeting. Their vociferous questioning of the scientists who testified at the meeting so antagonized Robert Irvine, director of communications for Richardson-Merrell, that every time a lawyer was recognized, Irvine jumped up and pointed out that the questioner was an attorney who was engaged in litigation with his company. "I don't think this FDA hearing should be used for the process of discovery," Irvine kept saying. Finally, FDA panel chairman David Archer, of the University of Pittsburgh School of Medicine, declared that all further questions must be submitted to him in writing and he would then determine whether they would be answered.

One thing Belli and the other lawyers involved in litigation with Richardson-Merrell believe they have going for them is the company's past reputation. In the early 1960's the company tried to introduce thalidomide into the United States and marketed the drug in Canada. It was successfully sued on behalf of a number of U.S. children whose mothers were given thalidomide by doctors who received the drug as free samples, and on behalf of Canadian thalidomide children. The settlements ranged from $100,000 to $999,000.

Just before thalidomide, in 1960, Richardson-Merrell marketed Mer-29, a cholesterol-lowering drug that it envisioned millions of Americans taking each day like a vitamin pill. But Mer-29 turned out to cause cataracts and was withdrawn from the market in 1962. Richardson-Merrell was indicted for making false, fictitious, and fraudulent statements to the FDA about Mer-29 and was fined $80,000. Following the criminal indictment, 500 civil suits were filed by injured persons and Richardson-Merrell ended up paying $200 million in damages.

Public agitation about Bendectin began last October with an article in the *National Enquirer* that also compared the drug to thalidomide and included pictures of babies with deformed arms or legs. Prominently featured in the article was David Mekdeci, the Orlando, Florida, boy who was to be the subject of the first Bendectin lawsuit.

In January 1980 the trial involving David Mekdeci took place. The boy's parents, Michael and Elizabeth Mekdeci, sued Richardson-Merrell for $12 million. The Florida jury concluded that nothing should be awarded to the boy and denied any money

to his parents for damages. It did, however, award the parents $20,000 for medical expenses. In May, Federal Judge Walter E. Hoffman ordered a new trial because, he said, the jury's verdict was "inconsistent." He argued that if the child was not damaged by Bendectin, the parents should not be awarded anything. A retrial is scheduled for January 1981, but Belli, "for reasons of honor and self-respect," asked not to represent the family the second time around. Belli calls Mrs. Mekdeci "a very difficult woman to work with. Besides, we've got much better cases."

The FDA panel had an opportunity to hear four of the expert witnesses who testified for the plaintiffs in the Florida trial. Their data, said scientists who attended the meeting, were hardly convincing. FDA panel member Gordon Avery, of the Children's Hospital in Washington, D.C., said that "As far as I'm concerned, the purpose of the hearing was to objectively view the scientific data. None of these people brought anything other than special pleading."

These expert witnesses included William McBride of the Women's Hospital in Sydney, Australia, who was paid $5,000 a day to testify in Orlando. In contrast, Richardson-Merrell, pays witnesses $250 to $500 a day, and the most it has ever paid is $1000 a day. McBride was one of the first to suspect that thalidomide caused birth defects. He contends that Bendectin, too, causes deformed arms and legs, and he said at the trial that, in his opinion, Bendectin caused David Mekdeci's malformations. For much of his talk at the FDA meeting, McBride dwelt on the effects of thalidomide, leading Avery to say, "Dr. McBride, you have convinced me that thalidomide is a teratogen but I must in my own mind focus on the drugs that are in Bendectin."

Another of Belli's witnesses was Beverly Paigen of Roswell Park Memorial Institute. Paigen stressed that she is a cancer researcher, not a teratologist. Nonetheless, she concluded that Bendectin caused birth defects in 5 of 1000 babies whose mothers took the drug. D'Agostino commented to *Science* that "Her [Paigen's] interpretation of the data just is not warranted." He remarked, "The committee as a whole took them [Belli's four witnesses] as a set of presentations that didn't necessarily appear to contribute anything to the real discussion."

Despite the FDA panel's cautions and carefully worded conclusions, the forthcoming court cases will probably convince many women that Bendectin may cause birth defects. As a result of fear of Bendectin, Little predicts, doctors may start prescribing different drugs to combat nausea and vomiting, even though extremely little is known about alternative drugs. Despite the FDA panel's residual uncertainty about Bendectin's safety, it remains the best studied drug taken by pregnant women. "I wish we knew as much about aspirin," said one scientist at the meeting.

—Gina Bari Kolaia

Copyright © 1980 American Association for the Advancement of Science